05-536

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 209

CRAIL CREEK ASSOCIATES, LLC, a Montana
Limited Liability Corporation,

      Plaintiff and Appellee,

  v.

ROBERT W. OLSON,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV 99-163
Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Lisa A. Banick, Al Avignone; Garrity, Avignone & Banick,
Bozeman, Montana

      For Appellee:

            Richard J. Andriolo, Dorie Benesh Refling, Elisabeth Montoya;
Andriolo & Refling, PLLC, Bozeman, Montana

Submitted on Briefs:  November 9, 2006

Decided:  June 25, 2008

Filed:

_____
Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1     Robert W. Olson (Olson) appeals from the judgment entered by the Eighteenth Judicial District Court, Gallatin County, on a jury verdict in favor of Crail Creek Associates, LLC (Crail Creek), and from a later order denying Olson's motion to quash a writ of execution. We reverse and remand.

¶2     The restated issues are:

¶3     1. Did the District Court abuse its discretion by denying Olson's challenges for cause against two prospective jurors?

¶4     2. Did the District Court err by submitting a second supplemental verdict form to the jury, after the jury returned its special verdict form and first supplemental verdict form and was polled?

¶5     3. Did the District Court err by denying Olson's, and granting Crail Creek's, motion for judgment as a matter of law on Crail Creek's construction lien claim?

¶6     4. Did the District Court err by determining Crail Creek was entitled to attorney fees, costs, and prejudgment interest?

¶7     5. May Crail Creek retain in a lawyer trust account the funds it obtained from the title company via a writ of execution on the judgment?

**BACKGROUND**

¶8     In 1997 and 1998, Crail Creek contracted with Westfork Development Company, Inc. (Westfork) to construct condominiums on Crail Creek's property near Big Sky, Montana. In 1998, Crail Creek entered into a buy-sell agreement with Olson for a condominium unit.

Closing occurred in March of 1999, before construction of the unit was complete, and the parties signed documents providing that the title company would hold back $69,000 of the purchase price in an account. A dispute arose, and Crail Creek ultimately sued Olson, asserting claims for breach of contract and foreclosure of a construction lien, among other things. Olson counterclaimed, asserting several different causes of action.

¶9     The case proceeded to trial in 2004. Shortly before jury voir dire, the District Court orally denied the parties' cross-motions for partial summary judgment. During voir dire, the District Court denied Olson's challenges for cause of two prospective jurors. Before submission of the case to the jury, the court orally granted Crail Creek's, and denied Olson's, motion for judgment as a matter of law on Crail Creek's construction lien claim. Notwithstanding that ruling, the special verdict form included a question regarding Crail Creek's entitlement to the construction lien. During deliberations, the jury submitted a question regarding the holdback funds, and the District Court sent a supplemental verdict form to the jury.

¶10     The jury returned the special verdict form and first supplemental verdict form (together, the "initial verdict") and was polled. After hearing arguments outside the presence of the jury regarding the total amount the jury intended to award, the District Court submitted a second supplemental verdict form to the jury. The jury completed the second supplemental verdict form, indicating its intent to award a total of $77,409.99 to Crail Creek. The District Court subsequently entered judgment on the verdict, awarding $77,409.99, together with costs totaling $2,870.40, prejudgment interest in the amount of $24,768.32, and

3

attorney fees totaling $94,072.17. The judgment also specified that the $69,000 of held back funds in the title company account be disbursed to Crail Creek and applied to the judgment and, pursuant to the parties' stipulation, any interest "accruing" on those funds be disbursed to Crail Creek for application to the prejudgment interest.

¶11 Crail Creek obtained a writ of execution, a levying officer collected from the title company account the funds and interest accrued up to that time, and Crail Creek placed the funds and accrued interest in a lawyer trust account. Olson disputed the legality of these actions and, after filing his notice of appeal, moved to quash the writ of execution. The District Court determined it lacked jurisdiction to rule on Olson's motion due to the pending appeal. We set forth additional facts as necessary below.

## DISCUSSION

¶12 **1. Did the District Court abuse its discretion by denying Olson's challenges for cause of two prospective jurors?**

¶13 Section 25-7-223, MCA, sets forth the bases for a challenge for cause in a civil case. We review a trial court's denial of a challenge for cause for abuse of discretion. *Henricksen v. State*, 2004 MT 20, ¶ 87, 319 Mont. 307, ¶ 87, 84 P.3d 38, ¶ 87 (citing *Reff-Conlin's, Inc. v. Fireman's Fund Ins. Co.*, 2002 MT 60, ¶ 16, 309 Mont. 142, ¶ 16, 45 P.3d 863, ¶ 16). Olson contends that the District Court abused its discretion by denying his challenges for cause of prospective jurors Rita Foster and Paige Weirich.

¶14 Regarding Foster, Olson asserts her voir dire responses showed she "ha[d] an unqualified opinion or belief as to the merits of the action" and a "state of mind . . . evincing enmity against or bias in favor of either party," which are bases for removing a prospective

4

juror for cause under §§ 25-7-223(6) and (7), MCA. The following exchange occurred during voir dire between one of Crail Creek's attorneys and Foster:

> MR. ANDRIOLO: Mrs. Foster, is there anything here that would create any problems for you?
>
> MS. FOSTER: A couple things. I'm an office manager for a plumbing company and I'm the only person who does that job. You know, eight days is a lot to be away from the company. On top of that, I work in construction and always have, and I'm not really fond of contractors and owners doing the whole court thing. Also, Ms. Refling [co-counsel for Crail Creek] represented me with a matter when my mother was in the county rest home.
>
> MR. ANDRIOLO: Is she representing you at the present time?
>
> MS. FOSTER: No.
>
> MR. ANDRIOLO: And is there anything in that that would cause you to be more favorable or more inclined to her than the rest of the—
>
> MS. FOSTER: Probably.
>
> MR. ANDRIOLO: Probably? And do you feel you could be fair and impartial in the case?
>
> MS. FOSTER: Probably not.
>
> MR. ANDRIOLO: And I think I ask this question sometimes because you get more of an answer than—but why don't you feel you could be fair and impartial?
>
> MS. FOSTER: I kind of feel like I already made up my mind about it.
>
> MR. ANDRIOLO: Well, what are the facts of this case do you know [sic]?
>
> MS. FOSTER: Just I'm more prone to contractors than owner, I think.
>
> MR. ANDRIOLO: So, it's just a general bias you have as a whole. And you think that would take evidence to remove that particular bias from your—you couldn't just listen to the evidence here and based on that evidence, make a fair assessment?

MS. FOSTER: I really don't know if I could.

MR. ANDRIOLO: Would you be willing to try to do that?

MS. FOSTER: I could try but I'm also, like I say, thinking about my job, but I don't know if I could.

MR. ANDRIOLO: I take it from—you're not sure you could but you're not sure you can't. Would that be a correct way to say it?

MS. FOSTER: Right. Yes.

MR. ANDRIOLO: Well, you know, I think that when we get a jury, we're not looking for people that haven't got some experience in the world. I mean, you've come here with your worldly experiences and your good common sense and that's what makes you a good jury, and that's what we're looking for. We're not looking for people that have lived in a—just in an environment that they haven't experienced life and—because we need that input into the process. You all come from different walks and you all have different things to offer. So, I don't know. But that's kind of where we're going.

Crail Creek's counsel then proceeded to question other prospective jurors.

¶15    Olson's attorney later had the following exchange with Foster:

MS. BANICK: Could you tell me a little bit about the matter that Dorie Refling represented you in?

MS. FOSTER: She just did some paperwork for me for my mother.

MS. BANICK: For your mother?

MS. FOSTER: Um-hum (yes).

MS. BANICK: And was it like a transaction or a [w]ill, or something like that?

MS. FOSTER: It was a legal document.

MS. BANICK: Do you feel uncomfortable telling me what that was or—

MS. FOSTER: Yes.

MS. BANICK: Judge, could I maybe go in chambers and just find out what that is?

THE COURT: I'm not sure why it's relevant if it was for her mom. I mean, she's indicated that—I believe she indicated that it wouldn't affect her ability to consider things.

MS. BANICK: Well, I'd just like to explore a little bit more—she said Dorie Refling had represented her and I'm just trying to—

THE COURT: She said she prepared some legal documents for her mother. I don't know that—

MS. FOSTER: She didn't represent me per se in a court action or anything like that. She just prepared some legal documents for my mother.

MS. BANICK: And how did you go about going to Dorie Refling?

MS. FOSTER: One of my best friends works in her office.

MS. BANICK: And who is that?

MS. FOSTER: Sonya Rogers.

MS. BANICK: Could you repeat that?

MS. FOSTER: Sonya Rogers.

MS. BANICK: And when—this is your best friend that works in Dorie Refling's office?

MS. FOSTER: Yes.

MS. BANICK: And when you say "Dorie Refling's office," you're talking about Andriolo and Refling, the law firm?

MS. FOSTER: Yes.

MS. BANICK: And do you have other contact with Dorie or Mr. Andriolo through Sonya?

7

MS. FOSTER:  No.

MS. BANICK:  And how often do you see Sonya or speak with Sonya?

MS. FOSTER:  I talk to her as often as once a week and sometimes every other week.

MS. BANICK:  And have you spoken with Sonya about this case at all?

MS. FOSTER:  No.

MS. BANICK:  And does Sonya know that you've been called as a juror to sit on this case that the law firm where she works at is representing one of the parties?

MS. FOSTER:  No.  I didn't know until I got here this morning what the case was about.

MS. BANICK:  And what kind of friendship do you have with Sonya?  Is it a social type thing, you go out?

MS. FOSTER:  We used to work together and, yeah, we go out to lunch, dinner.

MS. BANICK:  How frequently?

MS. FOSTER:  Lunch, once a month minimum.

MS. BANICK:  And you consider her a good friend?

MS. FOSTER:  Yes.

MS. BANICK:  And is there a possibility that you might be influenced or feel like you're rooting for one side because Sonya works at the law firm that's representing one of the parties here?

MS. FOSTER:  Probably.

MS. BANICK:  Your Honor, I would challenge this juror for cause.

¶16    The District Court then questioned Foster:

8

THE COURT: Ms. Foster, are you saying you can't put aside whatever information you might have received in the past from your friend and be fair and listen to Ms. Banick equally?

MS. FOSTER: I haven't heard anything from her regarding this case.

THE COURT: Nor have you heard anything from the other side regarding this case.

MS. FOSTER: Right.

THE COURT: So, are you saying that because of your friendship with Sonya that you cannot be fair to Ms. Banick?

MS. FOSTER: Well, not only am I partial to that law firm, I also lean more towards the general contractor than the owner in these type of situations.

THE COURT: These type of situations, which you haven't heard anything about yet?

MS. FOSTER: Well, working in construction as long as I have, I've actually been involved in a lot of change orders and contract disputes.

THE COURT: And in all that time, you've never had a problem with a contractor?

MS. FOSTER: No. We usually work it out.

THE COURT: I didn't ask whether you worked them out, but you've had—I mean you understand that issues come up.

MS. FOSTER: Right, I do.

THE COURT: Mr. Andriolo?

MR. ANDRIOLO: I don't take any position on it, Your Honor.

THE COURT: Ms. Foster, I'm going to ask that you stay.

MS. BANICK: Judge, I'd just like you to note it's not—

THE COURT: It's noted on the record.

9

Olson subsequently used a peremptory challenge to remove Foster, and exhausted all of his peremptory challenges.

¶17 Regarding the "unqualified opinion or belief as to the merits" and "state of mind . . . evincing enmity against or bias in favor of either party" language in §§ 25-7-223(6) and (7), MCA, Olson advances *Mahan v. Farmers Union Cent. Exchange*, 235 Mont. 410, 768 P.2d 850 (1989). There, we determined the trial court improperly denied challenges for cause of two prospective jurors, one who expressed a fixed scruple against punitive damages and another who stated he preferred the "management side" and appeared to have difficulty speaking and hearing. Noting the trial court's questions were general in nature and not directed to whether the prospective jurors had a state of mind evincing enmity or bias, we determined a party's attorney was wrongly forced to waste peremptory challenges. *Mahan*, 235 Mont. at 418, 768 P.2d at 855.

¶18 Olson maintains the present case is similar to *Mahan* with respect to Foster's inclination to favor contractors. He also asserts Foster demonstrated an unqualified opinion or belief, as well as a state of mind evincing enmity or bias, as contemplated in §§ 25-7-223(6) and (7), MCA, by stating she had made up her mind about the case, generally favored contractors over owners, and would probably favor Crail Creek because her friend worked at the firm representing Crail Creek and Refling had done some legal work for her mother. In addition, Olson asserts Foster's responses to the District Court's questions confirmed her bias.

¶19 Crail Creek responds that Foster was merely an apparently angry and reluctant

prospective juror whose mother had a prior attorney-client relationship with Refling, and the District Court assessed Foster's demeanor and properly denied the challenge. Advancing *Anderson v. Burlington Northern, Inc.*, 218 Mont. 456, 709 P.2d 641 (1985), and *Williams v. Rigler*, 234 Mont 161, 164, 761 P.2d 833, 835 (1988), Crail Creek further asserts that neither general animosity nor a prior attorney-client relationship is sufficient grounds for granting a challenge for cause. We note that, in *Anderson*, the prospective juror denied feeling animosity. *Anderson*, 218 Mont. at 463, 709 P.2d at 646.

¶20     In any event, as set forth above, Foster consistently stated she felt she had made up her mind about the case, her friendship with Rogers and prior interaction with Refling would probably influence her, she was inclined to favor contractors and she did not know if she could set aside her beliefs. Foster's responses to the District Court's questions—acknowledging that construction disputes occur and she did not know the facts of this case—failed to cure, undo or "rehabilitate" her earlier-stated biases. We conclude Foster expressed more than general animosity or reluctance to serve as a juror, and her responses provided sufficient "unqualified opinion" and "state of mind evincing bias" grounds for Olson's challenge for cause under §§ 25-7-223(6) and (7), MCA.

¶21     Crail Creek also argues, however, that Olson did not sufficiently assert and preserve his challenge for cause of Foster. In this regard, Crail Creek advances various cases, including *Simons v. Jennings*, 100 Mont. 55, 60, 46 P.2d 704, 706 (1935), for the proposition that a party challenging a prospective juror for cause must specify the statutory basis of the challenge. Neither *Simons*—a case in which a party articulated one statutory basis for a

11

challenge at trial and asserted a different statutory basis on appeal—nor any other case advanced by Crail Creek addressed a situation like that in the present case. Here, the District Court expressly afforded the party *opposing* the challenge the opportunity to state a position, counsel responded that he took no position, and the court cut off any further response by the party *asserting* the challenge.

¶22 On a related note, Crail Creek asserts, without citation to authority as required under M. R. App. P. 12(1)(f), that Olson was required to contest the District Court's denial of the challenge for cause after the court ruled. Absent authority, we decline to address this assertion. We conclude Olson sufficiently preserved his challenge for cause regarding Foster, and we further conclude the District Court abused its discretion in denying the challenge.

¶23 Relying on *Reff-Conlin's*, ¶¶ 28-31, Olson asserts that, when a trial court improperly denies a challenge for cause regarding a prospective juror in a civil case and a party is required to use a peremptory challenge to remove that prospective juror, prejudice is presumed as a matter of law and the appropriate disposition is automatic reversal and remand. In response, Crail Creek requests that we overrule the "automatic reversal" rule in *Reff-Conlin's*, and instead adopt the "rebuttal" standard proposed in the dissenting opinion in that case. *See Reff-Conlin's*, ¶¶ 32-43 (Cotter, J., dissenting). We observe, however, that Crail Creek does not attempt to meet the test for the "rebuttal" standard, which is that the prevailing party must demonstrate the lack of any reasonable possibility that the denial of the challenge for cause contributed to the verdict. *See Reff-Conlin's*, ¶¶ 37-38 (Cotter, J.,

dissenting). Because Crail Creek has not attempted to meet the "rebuttal" standard, we decline to further address the request that we adopt it.

¶24 Alternatively, Crail Creek contends we have limited application of the "automatic reversal" rule to those cases in which—unlike Olson in the present case—the challenging party moved for a new trial based on the denied challenge for cause. It advances *Armstrong v. Gondeiro*, 2000 MT 326, 303 Mont. 37, 15 P.3d 386, and *Bueling v. Swift*, 1998 MT 112, 288 Mont. 472, 958 P.2d 694. In each of those cases, a plaintiff asserted in a motion for a new trial that the district court had improperly granted additional peremptory challenges to multiple defendants upon erroneously determining the defendants' interests were "hostile" to one another. In *Armstrong*, ¶ 18, we set forth the § 25-11-102(7), MCA, basis on which a new trial may be granted, involving error during trial and excepted to by the party moving for a new trial. In *Bueling*, ¶¶ 21-22, we noted—and followed—earlier jurisprudence requiring a new trial when one party has erroneously been granted additional peremptory challenges. In neither case did we even hint that the "automatic reversal" rule applies only if the jury issues were preserved both contemporaneously and in a post-trial motion.

¶25 We conclude the District Court abused its discretion in denying Olson's challenge for cause regarding Foster and, applying the automatic reversal rule, we reverse and remand for further proceedings. Accordingly, we need not address the District Court's denial of Olson's challenge for cause regarding prospective juror Weirich.

¶26 **2. Did the District Court err by submitting a second supplemental verdict form to the jury, after the jury returned its initial verdict and was polled?**

¶27 On the special verdict form submitted as part of the initial verdict, the jury determined

13

Crail Creek was entitled to recover $29,671.86 for breach of contract. The jury also found Crail Creek was entitled to a construction lien. In a space following the phrase "[t]he total amount of Plaintiff Crail Creek Associates [sic] Construction Lien is," the jury answered "$47,738.17."

¶28 After the jury was polled, Crail Creek raised a question regarding the total amount of damages. During arguments outside the presence of the jury, both parties contended the construction lien claim could not stand alone as a basis for damages. Olson requested the District Court to enter a verdict for $29,671.86 in damages and reduce the amount of the lien to the amount of damages; alternatively, he moved for a new trial. Crail Creek asserted the special verdict form was confusing, the jury did not understand the "legal technicalities" and the jury intended to award damages of $29,671.86 plus $47,738.17. Crail Creek asked the court to submit a second supplemental verdict form requesting clarification. The District Court denied Olson's motion for a new trial and submitted a second supplemental verdict form to the jury. The jury responded that it intended to award $29,671.86 plus $47,738.13 [sic], for a total of $77,409.99.

¶29 The parties present numerous arguments about the second supplemental verdict form. Because we have reversed and remanded on Issue 1 and this unique situation is unlikely to recur on remand, we need not resolve this issue.

¶30 **3. Did the District Court err by denying Olson's, and granting Crail Creek's, motion for judgment as a matter of law on Crail Creek's construction lien claim?**

¶31 As noted above, the District Court submitted a question to the jury in the initial verdict form regarding Crail Creek's entitlement to the construction lien, after having granted

judgment as a matter of law on that question. More specifically, after the last witness testified, the events occurred in the following sequence: (1) the parties settled jury instructions, with the District Court denying requests to decide the parties' motions for judgment as a matter of law before settling jury instructions; (2) the District Court heard argument on the motions for judgment as a matter of law; (3) the next day, the parties discussed the special verdict form, without mentioning anything regarding the construction lien-related question on the form; (4) the District Court orally granted Crail Creek's, and denied Olson's, motion for judgment as a matter of law regarding the legality of the construction lien and a related waiver issue; (5) the District Court noted that it would use Crail Creek's "newly proposed verdict form" with minor modifications, and neither party mentioned the construction lien at that point; (6) the District Court instructed the jury, including instructions regarding when a party is entitled to a construction lien; (7) the parties presented closing arguments, with neither party mentioning the lien until Crail Creek's rebuttal argument that "[t]he Court has already found that there's a valid construction lien here. So what you need to do is determine the amount"; and (8) the District Court submitted the case to the jury, stating among other things that the jury was "to proceed through and answer the questions" on the special verdict form.

¶32 Advancing construction lien statutes and case law, the parties make numerous arguments regarding whether either of them was entitled to judgment as a matter of law. We note that, throughout the underlying proceedings, the parties and the District Court articulated various positions on whether issues of fact existed regarding the validity of the

construction lien, Crail Creek's entitlement to enforce it, the interpretation of certain documents, and the existence of one or more agency relationships allegedly related to the lien claim—including a possible agency relationship between Crail Creek and Westfork.

¶33 We review a district court's grant or denial of a motion for judgment as a matter of law de novo. *Schuff v. Jackson*, 2008 MT 81, ¶ 14, 342 Mont. 156, ¶ 14, 179 P.3d 1169, ¶ 14 (citation omitted). Judgment as a matter of law is only appropriate when there is a complete absence of any evidence which would justify submitting the issue to the jury. Judgment as a matter of law is not proper if reasonable persons could differ regarding conclusions that could be drawn from the evidence. *Schuff*, ¶ 24 (citations omitted).

¶34 In this extraordinary case, we simply cannot review pursuant to *Schuff*, ¶ 24, whether any evidence would justify submitting the issue to the jury, because it appears the issue was submitted to—and decided by—the jury. In this regard, notwithstanding the representation of Crail Creek's counsel during its rebuttal closing argument that the validity of the lien had already been decided in its favor, we must presume the jury followed the District Court's, and not counsel's, instructions in answering the construction lien-related question on the special verdict form. *See State v. Ariegwe*, 2007 MT 204, ¶ 168, 338 Mont. 442, ¶ 168, 167 P.3d 815, ¶ 168 (citations omitted). Moreover, our ability to review the District Court's ruling is significantly constrained because of the absence of any written order or memorandum by the District Court setting forth legal analysis supporting its lien-related determinations.

¶35 In light of the unusual circumstances surrounding this issue and having reversed and

remanded on Issue 1, we decline to address the parties' arguments regarding the applicability and effect of construction lien statutes and case law. We further decline to address whether the District Court erred in granting Crail Creek's motion for judgment as a matter of law on the construction lien claim.

¶36 In addition to our reversal and remand on Issue 1, we vacate the District Court's grant of judgment as a matter of law on the construction lien claim without expressing any view on the merits.

¶37 **4. Did the District Court err by determining Crail Creek was entitled to attorney fees, costs, and prejudgment interest?**

¶38 As noted above, the District Court awarded attorney fees, costs and prejudgment interest. In light of our reversal and remand on Issue 1, we reverse these awards and decline, at this juncture, to address the District Court's reasoning or the parties' arguments regarding who was the "prevailing party" and other matters.

¶39 **5. May Crail Creek retain in a lawyer trust account the funds it obtained from the title company via a writ of execution on the judgment?**

¶40 As noted above, a title company held back $69,000 of the purchase price in an interest-bearing account until, after judgment, a levying officer collected the funds and Crail Creek placed them in an Interest on Lawyers Trust Account (IOLTA). Olson asserts, and Crail Creek does not dispute, that interest on funds held in an IOLTA is not recoverable by a party. Indeed, Rules 1.18(c)(2)(E)(i) and 1.18(c)(2)(B) of the Montana Rules of Professional Conduct provide, respectively, that interest or dividends on an IOLTA must be remitted to the Montana Justice Foundation, and no client may receive interest or dividends earned on

17

funds in an IOLTA. Olson asks this Court to require Crail Creek, on remand, to immediately pay the funds currently in the IOLTA to the Clerk of the District Court until final disposition of this case and that we also order Crail Creek to pay to the Clerk 10% interest on those funds for the time they have been in the IOLTA to date.

¶41    The parties make numerous arguments about whether Crail Creek properly executed on the judgment, as well as the District Court's determination that it lacked jurisdiction to address this matter. We decline to address these arguments because, whatever determinations we might reach in those regards, the ultimate question at this juncture is whether the funds may *remain* in the IOLTA. We exercise our equitable powers in resolving that question.

¶42    In a somewhat different context, we have reasoned that a party who takes property by force of a judgment not yet final is a trustee, subject to making restitution as a court of equity might order if the judgment is overturned. *See Aye v. Fix*, 192 Mont. 141, 147, 626 P.2d 1259, 1263 (1981). "'The right to recover what one has lost by enforcement of a judgment subsequently reversed is well established.'" *Reil v. State Comp. Mut. Ins. Fund*, 254 Mont. 274, 278, 837 P.2d 1334, 1337 (1992) (quoting *Waggoner v. Glacier Colony of Hutterites*, 131 Mont. 525, 528, 312 P.2d 117, 118 (1957)); *see also Hansen v. Hansen*, 134 Mont. 290, 295, 329 P.2d 791, 793 (1958). In *Waggoner*, we recognized a split of authority regarding the necessity of a final judgment before a court may order restitution of property or funds obtained via a judgment reversed on appeal. We then stated "yet we believe that most authorities agree that restitution should be granted when to do otherwise would give offense

18

to equity and good conscience." *Waggoner*, 131 Mont. at 529, 312 P.2d at 119.

¶43    As set forth above, prejudgment interest-related issues—the merits of which we have declined to address in Issue 4—arose in the proceedings leading to this appeal. Before Crail Creek's execution on the judgment, the title company held the funds in an interest-bearing account and, indeed, it appears Crail Creek obtained approximately $8,000 in interest from the title company account along with the $69,000 in holdback funds. At this juncture, placing the funds in an interest-bearing account and under neutral control would return the parties to a status more akin to their status prior to the judgment and execution thereon. Moreover, if a party ultimately is awarded prejudgment interest, any interest accrued after remand in an account administered by the Clerk of the District Court could be applied to that award, rather than requiring the party against whom final judgment is entered to produce any interest out-of-pocket. Under the circumstances of this case, we conclude it would be inequitable to allow Crail Creek to retain the funds in an IOLTA, and we order Crail Creek to pay the funds to the Clerk of the District Court, to be held in an interest-bearing account until final disposition.

¶44    We decline, however, to address Olson's request that we order Crail Creek to submit 10% interest on the funds for the time they already have been in the IOLTA. If it becomes necessary and appropriate for that issue to be resolved on remand, we are confident the parties or the District Court will do so.

¶45    Reversed and remanded for further proceedings consistent with this Opinion.

/S/ KARLA M. GRAY

We concur:

19

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ JOHN WARNER
/S/ BRIAN MORRIS

Justice Patricia O. Cotter concurs.

¶46     I concur in the Court's Opinion because it correctly applies the law to the facts of this case.  I continue to maintain, however, that what the Court here characterizes as the "rebuttal standard" (Opinion, ¶ 18), the adoption of which I urged in my dissent in *Reff-Conlin's,* should be applied in those civil cases where the prevailing party affirmatively demonstrates that there is no reasonable possibility that the district court's erroneous denial of a challenge for cause could have contributed to the verdict.

/S/ PATRICIA COTTER

Justice Jim Rice joins in the Concurrence of Justice Patricia O. Cotter.

/S/ JIM RICE